UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WENDELL DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-CV-902-ZMB |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI | ) | |
| and OFFICER AMON FIGGS, *in his* | ) | |
| *individual capacity*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Before the Court is Defendant Amon Figgs's Motion for Summary Judgement on Plaintiff Wendell Davis's remaining claims for excessive force and unreasonable seizure under 42 U.S.C. § 1983. Even after considering the record in a light most favorable to Davis, the Court concludes that Figgs is entitled to qualified immunity, and thus grants him summary judgment.

### BACKGROUND

**I.      Factual Background**

The following facts are not in dispute. On August 31, 2017, Detective Figgs was patrolling the streets of St. Louis and looking for stolen vehicles as a member of the Anti-Crime Task Force. Doc. 103 ¶¶ 1–2. Figgs spotted a parked Ford Explorer with license plate number D**I**V277, which was a near-match for a stolen vehicle on his "hot sheet" with license plate number D**1**V227. *Id.* ¶¶ 2–3 (emphasis added). After calling in the vehicle, Figgs conducted surveillance and saw two men enter the Explorer, with Davis getting into the passenger seat. *Id.* ¶¶ 4–6. After the Explorer pulled away, Figgs followed a short distance and then activated his lights and sirens to initiate an investigative stop. *Id.* ¶¶ 7–8. The Explorer attempted to flee but was stopped by other Anti-Crime officers, who deployed spike strips that immobilized the SUV. *Id.* ¶¶ 9–10.

But the pursuit continued after both occupants fled on foot. *Id.* ¶ 11; Doc. 119 ¶ 1. Davis ran down an alleyway, across an open field, and down the street, with Figgs chasing after him. Doc. 103 ¶¶ 11–12. Figgs had his gun drawn and, at some point, ordered Davis to "get down" and "freeze." *Id.* ¶¶ 11, 13, 16. The chase culminated near a parked HHR Chevrolet. *Id.* ¶ 15. After reaching the Chevy, Davis worked the gun he had been carrying down his pantleg. *Id.* ¶ 17. Figgs saw Davis pushing an object down his pants and "didn't feel safe" knowing it might be a gun. *Id.*; Doc. 98-1 at 11–12. Davis claims he "jiggled" the gun out into the street but agrees that Figgs never saw him discard it. Doc. 103 ¶¶ 17, 19, 24; Doc. 119 ¶ 3. Indeed, at the time, the entirety of the Chevy was between them. Doc. 103 ¶ 17; Doc. 119 ¶¶ 3–6; *see also* Doc. 103-1 at 56–60.

Davis decided to run again, and as he turned his back, one of his hands was "facing towards" Figgs. Doc. 119 ¶ 12; Doc. 103-1 at 131–33. Figgs believed he saw a gun in Davis's hand. Doc. 103 ¶ 19; Doc. 119 ¶¶ 28–31. He then shot Davis in the back, seriously injuring him. Doc. 119 ¶¶ 12, 21. When another officer arrived on scene, Figgs alerted him to Davis's firearm by saying "gun, gun." Doc. 98-1 at 54–55. At the hospital, Davis told another officer that he "got shot for no reason" because "all I wanted to do was get the gun off me. That's all I wanted to do." Doc. 103 ¶ 26.

The parties also dispute several facts, including: (1) whether Davis and Figgs circled the Chevy several times and where they were standing before the shooting took place, *id.* ¶ 17; (2) whether Davis was armed at the time of the shooting and pointed his gun at Figgs, *id.* ¶ 19; (3) where the gun landed, *id.* ¶ 24; and (4) the exact contours of testimony provided by a third-party eyewitness, Doc. 119 ¶¶ 22–23. Notably, while the parties dispute several facts regarding the foot chase, Davis does not contest that Figgs saw him working an object down his pantleg. Doc. 103 ¶ 17. Further, Davis's objections to Figgs's statement that he believed Davis had a gun in his hand focus entirely on whether he *actually* had a gun at the time, as opposed to contesting Figgs's honest—if mistaken—belief. *Id.* ¶¶ 19, 22.

## II.    Procedural Background

Davis originally brought this civil-rights action in August 2022. Doc. 1. The Complaint asserts an excessive-force claim against Figgs for the deployment of spike strips and the shooting, an unreasonable-seizure claim for the shooting, municipal-liability claims against the City of St. Louis, and two state-law tort claims. *Id.* ¶¶ 20–61. The City moved to dismiss all but the section 1983 claims against Figgs related to the shooting. Doc. 8. After denying Davis's intervening motion to amend his complaint as to the municipal-liability claims, the Court granted the partial motion to dismiss. *See* Doc. 49. Following discovery, Figgs filed his Motion for Summary Judgment. Doc. 96. While that motion was pending, Davis renewed his request to amend his complaint, Doc. 101, which the Court again denied for similar reasons, Doc. 140. After the parties submitted thorough briefing, Docs. 97–98, 103–104, 118–119, the motion for summary judgment is ripe for adjudication.

## LEGAL STANDARD

## I.    Summary Judgment

Summary judgment must be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When deciding a motion for summary judgment, a court is required to view disputed facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor." *Sherr v. HealthEast Care Sys.*, 999 F.3d 589, 597 (8th Cir. 2021) (citation omitted). Courts may not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, "the focus is on whether there are genuine issues of material fact for trial." *Sherr*, 999 F.3d at 597 (citation omitted). "A genuine issue for trial exists when a reasonable jury could return a verdict for the nonmoving party." *Huber v. Westar Foods, Inc.*, 139 F.4th 615, 620 (8th Cir. 2025)

3

(quotation omitted). "Substantive law in the relevant area dictates which facts are material, as only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Sherr*, 999 F.3d at 597 (quotation and alteration omitted). "Where the parties and witnesses have different recollections of the events at issue, the question is whether there are *material* issues of disputed facts that would permit a reasonable jury to return a verdict for the nonmoving party based on the evidence." *Green v. City of St. Louis*, 134 F.4th 516, 523 (8th Cir. 2025) (quotation and alteration omitted).

## II.      Excessive Force and Unreasonable Seizure

Davis has alleged that his shooting was a violation of his Fourth and Fourteenth Amendment rights. Doc. 1 ¶¶ 29, 34. The Fourth Amendment guarantees the "right of the people to be secure against unreasonable seizures." *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020) (citation omitted). "The use of deadly force to restrain a person," such as shooting a suspect, "is a seizure under the Fourth Amendment." *Dimock ex rel. Dimock-Heisler v. City of Brooklyn Ctr.*, 124 F.4th 544, 552 (8th Cir. 2024) (citation omitted). While the Fourth Amendment reasonableness test examines "whether the amount of force used was objectively reasonable under the particular circumstances," it also requires that "reasonableness [] be viewed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Green*, 134 F.4th at 523 (quotation omitted). As the Supreme Court has instructed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

"Whether the use of deadly force is reasonable turns on the totality of the circumstances, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat

to the safety of the officer or others, and [3] whether the suspect is actively fleeing or resisting arrest." *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016) (quotation omitted). The Eighth Circuit has further held that, "[i]n dangerous situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject actually points a weapon at the officer or others." *Liggins*, 971 F.3d at 801. "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Dooley v. Tharp*, 856 F.3d 1177, 1181 (8th Cir. 2017) (quotation omitted). "At the summary judgment stage, once the predicate facts are established, the reasonableness of an officer's conduct under the circumstances is a question of law." *Green*, 134 F.4th at 523 (quotation and alterations omitted).

## III.    Qualified Immunity

Officers accused of violating civil rights under section 1983 are entitled to assert the defense of qualified immunity, which shields them from civil lability. Qualified immunity applies unless the plaintiff shows "(1) [the officer] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Maser v. City of Coralville*, 139 F.4th 1004, 1009 (8th Cir. 2025) (quotation omitted). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law." *Parker v. Chard*, 777 F.3d 977, 979–80 (8th Cir. 2015) (quotation omitted).

"[B]ecause the focus [of qualified immunity] is on whether the officer had fair notice that the conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Smith v. City of Minneapolis,* 754 F.3d 541, 546 (8th Cir. 2014) (quotation omitted).

5

In assessing whether a right is clearly established, "there does not have to be a previous case with exactly the same factual issues," but the right also "should not be defined at a high level of generality." *Williams v. City of Burlington*, 27 F.4th 1346, 1352 (8th Cir. 2022) (quotations omitted). As relevant here, it is clearly established "that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officers or others is not permitted." *Id.* (citation omitted). But "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012) (citation omitted).

## DISCUSSION

While the parties offer differing "accounts of the moments leading up to the shooting," Doc. 104 at 1, that fact alone does not preclude summary judgment. What matters is whether there are "genuine issues of *material* fact." *Sherr*, 999 F.3d at 597. Here, the disputed facts are not outcome determinative for purposes of qualified immunity. Even after viewing the record in the light most favorable to Davis, Figgs did not violate his constitutional rights or violate clearly established law at the time of the shooting. Accordingly, Figgs is entitled to qualified immunity.

## I.      Whether the Factual Disputes Are Material

In resisting summary judgment, Davis first claims that this case presents genuine disputes of material fact that must be decided by a jury. Doc. 104 at 5–10. Specifically, he argues that "Figg's counsel insert[ed] their own narrative [in the summary-judgment briefing], separate from the clear dispute between the parties." *Id.* at 6. But Davis is wrong that there is anything untoward in Figgs making a summary-judgment argument that differs from what he believes the evidence would show at trial, and the other disputes he identifies do not affect qualified immunity.

6

The first question is whether Figgs's argument that he "only 'perceived' a gun and that he 'mistakenly' shot [Davis] . . . must be completely disregarded" as inconsistent with his prior testimony. *Id.* at 9. It is true that Figgs made several sworn statements about the shooting, and as Davis apparently concedes, "***all*** [were] consistent and unequivocal that [Davis] pointed a gun directly at him." *Id.* at 4 (quoting Doc. 103 ¶¶ 28–31). But Davis is simply wrong that the St. Louis City Counselor's Office[1] "disregard[ed] its own client's testimony" in its summary-judgment briefing. *Id.* at 7. As an initial matter, Figg's memorandum notes his longstanding account of events and attempts to undermine Davis's claim that he dropped the gun before the shooting. Doc. 97 at 11–12. Unsurprisingly, his counsel then made an alternative argument that, even crediting Davis's claims, the shooting was still justified. *Id.* at 13; *see also* Doc. 118 at 2 ("Despite Plaintiff's assertions of disputed facts, the parties agree on enough facts to warrant qualified immunity for Figgs.").

Davis further alleges that this is a common "tactic" for the City Counsellors Office, and he points to another case where this Court disregarded an inconsistent argument from officers who newly alleged mistaken perceptions as grounds for qualified immunity at summary judgment. *See Ball-Bey v. Chandler*, No. 4:18-CV-1364-SPM, 2024 WL 5379123, at *9–11 (E.D. Mo. Aug. 23, 2024). Despite Davis's assertions, the facts presented here differ from *Ball-Bey*. There, the officers claimed to have seen a gun in the suspect's hand, but they also admitted seeing him throw the gun away and failed to offer any plausible basis for mistakenly seeing a second gun. *Id.* Here, Figgs undisputedly saw Davis working an object down his pantleg. *See* Doc. 103 ¶ 17. Figgs also testified that he believed that the object was a firearm. *Id.* And that object was, in fact, a gun that Davis claims to have worked free from his pants prior to the shooting. *Id.* Further, as noted above, Davis does not dispute that Figgs believed he saw a gun, instead asserting that the gun could not have

---

[1] While Figgs is currently represented by the Missouri Attorney General's Office, at the time of the briefing, the St. Louis City Counselors Office represented him.

7

been in Davis's hand. *See id.*; *see also* E.D. MO. L.R. 4.01(E) ("All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."). In other words, Figgs's argument does not create a dispute of material fact as to whether Davis had a gun; it is instead an argument that, even crediting Davis's account that he did not have a gun, Figgs is entitled to qualified immunity.[2] As such, the Court will not disregard this point.

Second, Davis separately identifies three factual assertions by Figgs that "turn the summary judgment standard on its head." Doc. 104 at 9–10. On this score, the Court agrees with Davis that Figgs views these disputed facts in a light most favorable to himself. But even drawing the opposite conclusion on all three points does not change the outcome here.  Davis correctly contends that Court must assume that: (1) Davis did not have a gun pointed at Figgs when he turned to run, Doc. 104 at 9, (2) that Davis's statement in the hospital that "all he wanted to do was get the gun off [him]" meant that he had successfully discarded the gun but was still shot, *id.* at 9–10, and (3) that Davis dropped his gun near the curb, as opposed to near the back driver's side tire of the vehicle parked in front of the Chevy, Doc. 98 ¶ 24. But even accepting that Davis discarded his gun before the shooting occurred does nothing to undermine Figg's undisputed belief that he saw the weapon, making this dispute immaterial to the qualified-immunity analysis as explained below.

## II.     Whether Figgs Violated Davis's Constitutional Rights

Even after viewing the record in the light most favorable to Davis, Figgs did not violate his constitutional rights. A court determines whether a constitutional violation occurred by looking at whether the actions taken were "objectively reasonable" under the circumstances. *Green*, 134 F.4th

---

[2] The Court is not persuaded by Davis's assertion that, by accepting this argument, "every police officer" would be given license to shoot someone running away from them. Doc. 104 at 2. As an initial matter, other plaintiffs remain free to dispute an officer's belief as to seeing a gun. Moreover, it is far from clear that, in most cases of a suspect fleeing from police, there would be a factual basis justifying the officer's perception that the suspect was pointing a gun at them.

at 523. In doing so, the court may not take advantage of 20/20 hindsight but, rather, must consider "the information that the officer possessed at the time of his decision to use such force." *Id.* (quotation omitted). Given the undisputed facts, Eighth Circuit precedent shows that Figgs's actions did not violate Davis's constitutional rights.

It is undisputed that Davis and his associate fled from the police in the Explorer, requiring officers to deploy spike strips, and then proceeded to flee on foot after the car was disabled. Doc. 103 ¶¶ 7–12. Figgs chased Davis with his weapon drawn, which he felt was necessary to protect himself based on his experience with pursuing suspects in vehicles on a "hotsheet." Doc. 98-1 at 18–19, 80–82. During the initial part of the chase, Davis had a gun and, after approaching the HHR Chevrolet, he was working the gun down his pantleg. Doc. 119 ¶ 3. After Figgs saw Davis pushing an object down his pants that he thought might be a gun, he had no reason to believe that Davis discarded any weapon. And as Davis started to flee again after a brief confrontation, Figgs saw his hand was going back towards him holding what he believed was a firearm.Doc. 103 ¶ 17, 19, 22.

In assessing the reasonableness of deadly force, the Court must consider "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether the suspect is actively fleeing or resisting arrest." *Wallace*, 843 F.3d at 768. While the severity of the crime (a suspected stolen vehicle), cuts against the use of deadly force, the other two factors weigh heavily in Figgs's favor. Based on the most plaintiff-friendly version of the facts, Davis had first fled in the vehicle, then fled further on foot, and was doing so again—all by his own admission. Doc. 103 ¶ 20. In the ensuing split-second encounter, given Figgs's lack of knowledge that Davis had discarded his weapon, he reasonably feared that Davis posed an immediate threat to his safety when he saw Davis's hand going back toward him holding

9

what he believed was a gun. Indeed, the Eighth Circuit has found that there was no violation of a suspect's constitutional rights in nearly identical contexts.

For example, in *Loch v. City of Litchfield*, an officer shot an unarmed suspect based on a mistaken belief he had a firearm. 689 F.3d at 964. When the officer arrived on scene, a family member warned that the suspect was armed, but unbeknownst to the officer, the suspect almost immediately discarded the gun into the snow. *Id.* With the officer's weapon trained on him, the suspect then proceeded to walk toward the officer with his hands in the air and slipped, with his hand moving toward his waistband.[3] *Id.* The Eighth Circuit affirmed the grant of summary judgment to the officer for the resulting shooting despite his mistaken assumption because "a reasonable officer could believe that deadly force was necessary to protect himself from death or serious harm." *Id.* at 967.

Likewise, in *Thompson v. Hubbard*, the Eighth Circuit affirmed a grant of qualified immunity for the shooting of an unarmed suspect who moved his hands towards his waist while looking back at the officer. 257 F.3d 896, 898 (8th Cir. 2001). There, the officer was responding to a report of shots fired and an armed robbery. *Id.* He identified a potential suspect, who initially appeared to surrender before fleeing. *Id.* The ensuing foot chase ended at a fence, which the suspect jumped before looking back at the officer and moving his arms "as though reaching for a weapon at waist level." *Id.* The suspect's back was facing the officer, who was unable to see. *Id.* When the suspect failed to comply with an order to stop, the officer fired a fatal shot into his back. *Id.* Although no weapon was ever recovered, the Eighth Circuit held that "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Id.* at

---

[3] Although the suspect's family yelled that he was unarmed just before the shooting, the Eighth Circuit found that the officer "was in no position . . . to verify which version was true" in light of the rapidly evolving situation. *Id.* at 364, 367. The same is true here regarding Davis telling Figgs, "I don't got nothing on. I'm arm – I'm unarmed. I don't have anything" during their confrontation just before he started to flee again. Doc. 119 ¶ 9; Doc. 103-1 at 64.

10

899. And despite attacking the officer's credibility, the plaintiffs failed to adduce evidence showing that his actions were not objectively reasonable under the circumstances. *Id.* at 900.

Finally, in *Green v. City of St. Louis*, the Eighth Circuit affirmed a grant of qualified immunity based on a mistaken perception of fact. 134 F.4th 516, 520–22 (8th Cir. 2025). There, the parties disagreed on whether Green, an off-duty police officer at the scene of the crime, was approaching other officers with his gun pointed down towards the ground, or at another officer. *Id.* at 524. The Eighth Circuit noted that the officer's mistaken perception was not a material fact that precluded summary judgment because, even assuming facts in the light most favorable to the off-duty officer, it still was an objectively reasonable decision to shoot. *Id.* at 525–26. The Court recognized that "in hindsight the decision to shoot was unnecessary and highly unfortunate." *Id.* at 526. But "[v]iewing this tense, uncertain, and rapidly evolving situation from [the officer's] perspective" it was reasonable to "make the split-second decision that the suspect posed a significant threat of death or serious physical injury." *Id.* Similarly, here, a reasonable officer could have made the split-second decision that Davis presented a threat to him given the situation leading up to the shooting.

Davis's attempt to distinguish these cases is unavailing. He argues that, in *Loch*, the officer "clearly and unambiguously testified that he shot because" he thought the suspect was going for a gun, supported by the fact that the suspect's hand was moving towards a black object on his waistband, whereas Figgs insists he saw Davis point a gun. Doc. 104 at 15. But the Eighth Circuit noted in *Loch* that the presence of the black object was not necessary to its holding; even if the jury disbelieved that the officer thought the cellphone holder was a gun, "his use of force [would] still [be] objectively reasonable." 689 F.3d at 967. And, as explained above, Davis has conceded that Figgs at least believed he saw a gun in his hand by failing to object.[4] Similar to the officers in

---

[4] Davis makes a similar argument to distinguish *Liggins*, 971 F.3d at 801, noting that in that case, "the suspect admitted to having a gun in his hand and [was] running in the direction of the police officer," Doc. 104 at 15. The same goes

11

*Loch*, Figgs was forced to make a split-second judgment in circumstances that were "tense, uncertain, and rapidly evolving." *See Loch*, 689 F.3rd at 967 (citation omitted). If anything, Figgs's mistake is more excusable, as he perceived a deadly weapon being pointed at him.

In sum, given the circumstances, it was objectively reasonable for Figgs to fire given his belief that a gun may have been pointed at him. Accordingly, his use of force falls within the bounds of the objective-reasonableness standard required by the Fourth Amendment.

**III.    Whether Figg's Actions Violated Clearly Established Law**

While the Court could apply qualified immunity based on the above analysis alone, *Lee*, 35 F.4th at 1114, it will also analyze the clearly established prong to fully address the parties' arguments. Here, even if the shooting had violated Davis's rights, the state of the law at the time was not sufficiently clear as to make a reasonable officer aware that this conduct would run afoul of the Constitution.

It is clearly established that using deadly force to stop someone constitutes a seizure for the purpose of the Fourth Amendment. *Dimock*, 124 F.4th at 552. Likewise, "the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officers or others is not permitted." *Williams*, 27 F.4th at 1352 (citation omitted). The Court does not have to find an exact factual match to hold that a right was clearly established at the time of the incident. *McDaniel v. Neal*, 44 F.4th 1085, 1089 (8th Cir. 2022) ("While prior cases need not have expressly determined that the action in question is unlawful, in the light of pre-existing law the unlawfulness must be apparent."). But "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are

---

for Davis's attempt to distinguish in *N.S. ex rel. Lee v. Kansas City Board. of Police Commissioners*, 35 F.4th 1111, 1114 (8th Cir. 2022), which he contends "involved an officer who clearly testified he was making a mistake and an undisputed instance in which the suspect had suddenly turned back to face the officer who was chasing him, Doc. 104 at 15 n. 5. But those arguments fail for the same reason, as it is uncontested that Figgs believed that Davis was brandishing a gun at him, even if he was fleeing.

12

entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* at 1091 (citation omitted). Given these parameters, the cases that Davis puts forth are not enough to show that Figgs was on notice that his conduct was unlawful.

Consider *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009). There, the police had received reports that two or three black men were going to rob a convenience store, so officers conducted preemptive surveillance. *Id.* at 606–07. Officers noticed two black males, later determined to be 12- and 14-years old, walking toward an apartment complex near the store. *Id.* at 607. The 12-year-old had a toy gun tucked into his waistband. *Id.* The officers approached the boys and ordered them to drop to the ground without identifying themselves as police. When the 12-year-old was slow in getting on the ground, the officers fatally shot him. *Id.* The Eighth Circuit recognized that an officer's knowledge that they may encounter a dangerous situation did not, by itself, permit the use of deadly force. *Id.* at 611. Significantly, the Eighth Circuit also highlighted several material factual disputes in the witness accounts, including the position of a toy gun in the 12-year old's waistband, if his hands were up, and if the police identified themselves. *Id.* at 608–09; *see id.* at 610 ("If the trier of fact believes the officers' version of the facts, they would have had probable cause to believe that [the child] posed 'a threat of serious physical harm' to them."). Here, not only did Davis assume he was being pursued by a police officer,[5] but he was given an instruction during the chase to "stop" and "freeze" and in fact did so before turning to run again. Doc. 103 ¶¶ 13, 16. He then lowered his hands to chest height and had a hand facing Figgs, which Figgs believed had a gun in it. *Id.* ¶ 17. Thus, compared to *Nance*, Figgs's use of force is more justified because Davis

---

[5] Davis testified during his deposition that he believed the person pursuing him was a police officer based on a "chain" Figgs was wearing around his neck. Doc. 103-1 at 50–52. Figgs also testified that he was wearing a vest with "POLICE" written on it, Doc. 103-2 at 63, but Davis stated he did not notice it, Doc. 103-1 at 51.

13

assumed he was a police officer, and Figgs saw what he believed to be a firearm being pointed at him when he fired.

In *Capps v. Olson*, the Eighth Circuit affirmed a district court's denial of summary judgment when two factual issues were disputed. 780 F.3d 879 (8th Cir. 2015). Those facts were (1) whether the suspect had been fleeing or coming at an officer when he was shot, and (2) whether the officer actually believed that the suspect was armed in light of conflicting evidence. *Id.* at 884. Critically, in *Capps*, immediately after the shooting, the officer "radioed dispatch and stated shots fired, once subject down, and weapons unknown." *Id.* at 883. The Eighth Circuit held that the phrase "weapons unknown," coupled with other evidence, could be interpreted by a jury to mean that the suspect was unarmed, and further, that the officer did not really believe he had a weapon. *Id.* at 885. Figgs has consistently testified that he believed that Davis was pointing a gun at him when he fired, supported by the fact that he said "gun, gun" when another officer appeared on scene. Doc. 98-1 at 54. Unlike in *Capps*, there is no contrary evidence from which a reasonable jury could find that Figgs had reason to believe that Davis was unarmed. That Figgs's observation of a gun may have been a mistake alone does not preclude the defense of qualified immunity.

Finally, in *Wallace v. City of Alexander*, the Eighth Circuit denied an officer qualified immunity where she shot a man despite knowing that he had discarded his weapon. 843 F.3d at 765. When the suspect began to struggle while the officer was cuffing him, the officer's gun discharged, shooting the suspect in the back. *Id.* at 766. There were significant disputes of fact in *Wallace*, including two eyewitnesses who contradicted the officer's account and "reported . . . that she had grabbed her gun with both hands and shot Wallace in the back after he turned away from the patrol car." *Id.* Here, even viewing the facts in the light most favorable to Davis, there is no

14

contention that Figgs knew that Davis was unarmed at time of the shooting and nothing like the significant factual disputes akin to those in *Wallace*.

"At most, these cases would create uncertainty for someone in Officer [Figgs's] shoes. To prevail, however, [Davis] would have to establish that 'the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Lee*, 35 F.4th at 1115. Further, the similarity of a case like *Lee*—where the Eighth Circuit affirmed a grant of qualified immunity after officer shot an unarmed suspect who was attempting to raise his hands after accessing then inside of an unknown vehicle—to the instant situation, further confirms that the law was not "clearly established" at the time of the shooting. *Id.* at 1114–15. Accordingly, because neither the Court nor Davis have identified precedent clearly establishing that Figgs's use of force was excessive at the time of the shooting, "the Supreme Court's strict instructions on this point" compel a finding that Figgs is entitled to qualified immunity.[6] *See McDaniel*, 44 F.4th at 1092.

## CONCLUSION

Accordingly, the Court **GRANTS** Defendant Amon Figgs's [96] Motion for Summary Judgment and **DENIES** as moot the parties' [92], [94] motions to exclude experts. The Court will issue a separate Judgment to accompany this Memorandum and Order.

So ordered this 27th day of March 2026.

_____
ZACHARY M. BLUESTONE
UNITED STATES DISTRICT JUDGE

---

[6] Given its ruling on summary judgement, the Court denies as moot the parties' cross-motions to exclude certain experts. Docs. 92, 94. To be clear, although Davis does not suggest otherwise, his expert's proposed testimony does not create a dispute of material fact, as the expert analysis merely supports his contention as to the parties' relative positions leading up to the shooting, which the Court already accepted in its analysis.

15